1   Randolph Gaw (S.B. #223718)
    rgaw@gawpoe.com
2   Mark Poe (S.B. #223714)
    mpoe@gawpoe.com
3   Victor Meng (S.B. #254102)
    vmeng@gawpoe.com
4   Samuel Song (S.B. #245007)
    ssong@gawpoe.com
5   GAW | POE LLP
    4 Embarcadero, Suite 1400
6   San Francisco, CA 94111
    Telephone: (415) 766-7451
7   Facsimile: (415) 737-0642

8   Attorneys for Plaintiff Bulletin Marketing, LLC

9

10

11                  **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13

    BULLETIN MARKETING, LLC              Case No. 17-7211
14
                        Plaintiff,       **CLASS ACTION COMPLAINT**
15
         v.                              DEMAND FOR JURY TRIAL
16
    GOOGLE LLC.
17
                        Defendant.
18

19

20          Plaintiff Bulletin Marketing, LLC ("Bulletin") hereby makes the following allegations

21   against defendant Google, LLC ("Google"):

22          1.      This is a class action brought against Google for its failure to honor its

23   commitments to pay website publishers for the ad revenue that Google received from placing its

24   ads on those publishers' websites through the DoubleClick Ad Exchange ("AdX").

25          2.      Under the contract between Google and its AdX publishers, Google can withhold

26   payment of an AdX publisher's accrued earnings only if (i) such earnings were the product of

27   invalid activity **and** (ii) the withheld amounts are refunded to the advertisers.  Evidence recently

28   uncovered by various parties however, including the Wall Street Journal, reveals that when

                                        - 1 -
                                                              COMPLAINT

1    Google decides that ad impressions generated on an AdX publisher's website are invalid and

2    withholds that publisher's accrued earnings as a result, Google is **not** refunding that withheld

3    amount back to advertisers.  Instead, Google keeps those funds for itself in violation of its

4    contractual obligations with its AdX publishers.

5                                            **PARTIES**

6          3.      Plaintiff Bulletin Marketing, LLC is a New Hampshire limited liability company

7    that has its principal place of business in New Hampshire.

8          4.      Defendant Google LLC is a Delaware limited liability company that has its

9    principal place of business in California.  Google LLC was formerly known as Google, Inc. at the

10   time the parties first contracted with each other, but was subsequently converted to its current

11   business form.

12                                 **JURISDICTIONAL STATEMENT**

13         5.      The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is

14   a complete diversity of citizenship, and the amount in controversy exceeds $75,000.  Bulletin is

15   domiciled in New Hampshire, and its sole member is domiciled in the state of Texas.  Google is

16   domiciled either in Delaware or California and, on information and belief, its member(s) are all

17   domiciled in the states of Delaware or California.

18         6.      The Court has personal jurisdiction over Google because it transacts business in

19   California and because in the Google Service Agreement, it expressly consents to personal

20   jurisdiction in this Court.

21         7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google

22   resides and regularly conducts business in this district, and because the contract with Google at

23   issue in this lawsuit has a forum selection clause requiring that litigation of all disputes is handled

24   in the state or federal courts of Santa Clara County, California.

25                                 **INTRADISTRICT ASSIGNMENT**

26         8.      Google's headquarters is located in Mountain View, California, and therefore

27   assignment to the San Jose division of this Court is appropriate.

28

COMPLAINT

**FACTUAL ALLEGATIONS**

***Background on DoubleClick Ad Exchange (AdX)***

9.     Google is the largest online marketing/advertising business in the world.  The AdWords Advertising Program ("AdWords") is Google's primary advertising program.  AdWords advertisements are displayed in a variety of formats such as text and/or images, alongside or above search results, on webpages, in e-mails, on blogs, and/or in videos.

10.     The Google AdSense Content program enables online publishers of websites to partner with Google to earn revenue from AdWords advertisements displayed on websites under their ownership, license, registration and/or other control.  Google tracks each time Internet users click on advertisements displayed on AdSense publishers' websites and charges advertisers for each click.  Google pays the AdSense publishers a portion of the amount paid by advertisers for the clicks, while retaining the remaining portion for itself.

11.     Like AdSense, DoubleClick Ad Exchange also allows website publishers to display advertisements in exchange for a share of the advertising revenue paid to Google by the advertiser for each "impression" (i.e., each time a unique user views the publisher's website displaying an advertisement served to that website through AdX).

12.     AdX differs from AdSense in that it is a programmatic, real-time bidding exchange that allows publishers and advertisers to exercise far more granular control over what advertisements are displayed and how much is paid by the advertiser to display those advertisements.  It also allows advertisers from outside of the Google Display Network to buy inventory from the publisher, thus significantly increasing the demand.

13.     Advertisers can buy ad space on AdX.  AdX is an ad exchange, which means that it consolidates advertising demand from AdWords and other ad networks, exchanges, and demand-side platforms to participating AdX publishers.  Thus, for example, AdWords advertisers can end up buying ad space on the website of an AdX publisher.

14.     In layman's terms, advertisers have advertisements that they wish to display on websites and publishers have "inventory" (i.e., ad spaces on their websites) that can accommodate

the display of those advertisements.  AdX facilitates these two groups transacting together for their mutual benefit.

15.     Put differently, AdX is viewed by industry participants as a more sophisticated ad placement service compared to AdSense, and attracts more experienced and/or larger publishers.

16.     One feature of AdX is that Google allows businesses to participate on the publishing side even if they do not have their own website, but as managers of websites belonging to others.  Google calls such entities Network Partner Managers ("NPM").  Essentially, NPMs help Google manage smaller publishers and penetrate in new markets.  Bulletin was an NPM.

17.     Due to the sophisticated features offered by AdX, website content creators often engage NPM partners to focus on optimizing the revenue earned from Google advertisements placed on their websites (usually by selling ad space at the highest possible price), while those website content creators focus instead on content creation.

18.     These websites will accordingly be registered in the AdX program under the AdX account belonging to the NPMs.

19.     The Google Services Agreement, which Bulletin entered into, governs the relationship between AdX publishers and Google.  A true and correct copy of this contract is attached hereto as Exhibit 1.  The primary obligations of a publisher are set forth in Section 2.3 of the agreement, which requires that an AdX publisher adhere to Google's published AdX Guidelines and Google's technical protocols.

20.     The Google Services agreement also provides the following policies and procedures for Google's payments to AdX web publishers:

**Section 8.2: Google Payments**

(a)  For the Services, Google will pay Company an amount equal to the Revenue Share Percentage (listed on the front page of this Agreement) of Ad Revenues attributable to a calendar month.  This payment will be made in the month following the calendar month in which the applicable Ads were displayed provided that the amount owed to Company in a given month is above the minimum set forth in the AdX Guidelines.

(b)  Google's payments for the Services under this Agreement will be based on Google's accounting which may be filtered to exclude (i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google.

COMPLAINT

1

***Google Confiscates Bulletin and Other Publishers' Accrued AdX Earnings***

2       21.    Bulletin is a company that helps web publishers maximize the revenues they can

3   earn from displaying advertisements on their websites by helping them expose their inventory to

4   optimal demand.  Through AdX, Bulletin offered publishers access to the world's largest demand

5   pool.

6       22.    Bulletin also ensures that web publishers are complying with the requirements of

7   AdX, ranging from actions such as making sure that advertisements are placed in the proper

8   positions on the websites to vetting out objectionable content from those websites.

9       23.    Bulletin has worked extensively with Google as an NPM.  Bulletin substantially

10   performed its obligations under the Google Services Agreement, and ensured that its publisher

11   clients performed their obligations under the Google Services Agreement.  Bulletin and its

12   publisher clients properly displayed Google's advertisements in conformity with Google's

13   policies, did not display any impermissible content on their websites, and otherwise performed all

14   of their required contractual duties.

15       24.    On or around February 16, 2017, a few days before Google was due to pay

16   Bulletin its accrued AdX earnings, Google disabled Bulletin's AdX account and withheld

17   payment of all of Bulletin's accrued AdX earnings for the last earnings period.

18       25.    Bulletin was surprised by Google's actions, and asked its Google account

19   representative, Merri McCann, for guidance, as Bulletin managed multiple websites and it did not

20   know which websites might not have been in compliance with Google's policies.  Ms. McCann

21   responded with non-substantive information, and then ignored all of Bulletin's remaining e-mails.

22       26.    Ms. McCann's actions were in line with Google policy, as Google requires that its

23   account representatives cease all communications with AdX publishers once Google has disabled

24   their account and withheld their earnings.  Thus, these publishers have no effective way of

25   contesting Google's decision.

26       27.    Bulletin submitted an internal appeal to Google.  Google's appeal form is nothing

27   more than a pro forma document, and only asks very general, standardized questions without

28   permitting the user to elaborate on the reasons why Google's reasons for terminating their AdX

COMPLAINT

1   account and withholding their accrued earnings were erroneous.  In particular, because Google

2   did not actually inform Bulletin of what it did wrong, Bulletin had no way of knowing what facts

3   to provide to Google to get it to reconsider its decision.

4       28.     Google summarily rejected Bulletin's internal appeal by means of an auto-

5   generated e-mail that was sent a short time later.  On information and belief, nobody at Google

6   closely reviewed Bulletin's appeal, as the appeal form was designed to convey minimal

7   information to Google and give publishers the illusion that Google might reconsider its decision.

8       29.     In any event, Google prevented Bulletin from receiving the benefit of a meaningful

9   appeal of its decision to terminate its AdX account and withhold its accrued AdX earnings, as

10  Google refused to tell Bulletin the reason Google terminated its account.

11      30.    Google's actions are particularly egregious because it always confiscates the

12  entirety of an AdX publisher's accrued earnings for the earnings period (which lasts two months)

13  even when the vast majority of that publisher's webpages (or in the case of an NPM, the vast

14  majority of its websites) are fully compliant with all Google policies.  In other words, if 5% of a

15  web publisher's traffic during an earnings period was invalid in some way, Google does not

16  withhold the publisher's earnings arising from that 5% of bad traffic.  Google withholds all of

17  those earnings, even though the earnings arising from the 95% of valid traffic were earned fair

18  and square in accordance with Google's policies.

19                      ***Google Lies About Refunding Its Advertisers***

20      31.     Per the express terms of Section 8.2(b) the Google Service Agreement, Google had

21  to pay an AdX publisher for impressions on its website except for "(i) invalid queries,

22  impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection

23  with Company's failure to comply with this Agreement, as reasonably determined by Google."

24  In other words, Google could withhold accrued earnings on an AdX publisher's website only if

25  (A) those earnings were the result of invalid activity, and if (B) Google had actually refunded its

26  advertisers for those amounts.  Section 8.2(b) is plainly written in the conjunctive rather than the

27  disjunctive.

28

COMPLAINT

32.     Additional context reinforces that simple textual reading of the Google Services Agreement.  On its Google Ads Traffic Quality Resource Center webpage, Google explains how it filters out invalid impressions and clicks for its advertisers.  A true and correct copy of this webpage is attached as Exhibit 5.

33.     As Google describes on its Google Ads Traffic Quality Resource Center webpage, it has three ways to detect invalid clicks: (i) filters, (ii) offline analysis, and (iii) investigations.  The latter methods – offline analysis and investigations – operate only after the advertiser has been charged for the impression or click.  The first method – filters – operates to weed out invalid clicks in real time before they are even charged to advertisers in the first place.  Thus, the first clause of Section 8.2(b) is simply explaining to publishers that in some instances, impressions on that publisher's website will not generate any revenue because those impressions were filtered in "real time" and the advertiser was never charged in the first place.  The second clause of Section 8.2(b) reassures publishers that when advertisers have, in fact, been charged for an impression that turned out to be invalid in some way, then Google could withhold payment to that publisher only if Google had refunded that advertiser.

34.     Google does not, however, refund its advertisers when it withholds payment of an AdX publisher's accrued earnings.  In a related lawsuit filed against Google in this Court by a plaintiff called AdTrader, Inc. ("AdTrader"), AdTrader uncovered incontrovertible evidence that Google keeps all funds it withholds from an AdX publisher for itself.

35.     For example, AdTrader was an NPM who had its AdX account disabled, and its accrued earnings withheld, by Google for some purported violation of a Google policy.  But AdTrader was also an advertising network, and during this same earnings period, its advertising clients had displayed ads on some of AdTrader's publishers' websites (unbeknownst to Google).  Even though all of AdTrader's accrued AdX earnings were withheld, to this day, Google has never paid any advertising refunds or credits to AdTrader or its advertising clients.

36.     Alerted to this inconsistency, AdTrader reviewed its records to see whether it had ever received a refund or credit from Google for running advertisements on websites that had invalid activity.  It did not, nor did any of AdTrader's advertising clients when AdTrader was

handling their accounts.  Google gave no refunds or credits even though, every single month, Google withheld a small amount of accrued earnings from AdTrader on its publishing activities for what it deemed to be invalid activity and claimed to have refunded the withheld amounts to its advertisers.  During these same months, however, AdTrader and its advertising clients had bought traffic from some of those same websites, so if Google's claim was true, then AdTrader and its advertising clients should have received some refunds or credits almost every month.

37.     AdTrader also inquired with a large New York agency, and several European agencies, whose identities are not being disclosed to avoid retaliation from Google, whether they or their clients had ever received a refund or credit for advertising funds spent on websites with invalid activity.  None of them had, even though multiple AdX and AdSense publishers (including Bulletin) have publicly stated or privately confirmed that Google always determines that a certain percentage of their clicks or impressions for any particular advertisement every month is invalid for one reason or another.

38.     Bulletin's representatives also did some investigation of their own.  A prominent journalist that has investigated Google in the past passed along the news that, over the years, their advertiser sources also confirmed that they had never received any refunds from Google, contrary to Google's representations.  But since advertisers had no visibility into what Google did with its publishers, no one ever raised any challenges to Google.

39.     Additional confirmation came by way of an August 25, 2017 article published in the Wall Street Journal.  The article explained that Google had detected a surge of ad fraud during the second quarter of 2017 on its DoubleClick Bid Manager product (which largely connects advertisers to AdX).  But rather than offer full refunds or credits to those advertisers, Google was offering only a modest reimbursement – only 7-10% of the total amounts spent by those advertisers at the most, with many advertisers receiving much less.  Not surprisingly, many advertisers were unhappy with this development.

40.     Also in this article, Google said that the refunds it was offering were appropriate "because it doesn't control the rest of the money spent."  This statement is untrue, as the vast majority of advertisements served through DoubleClick Bid Manager go to AdX publisher

websites, and Google routinely deducts or withholds payments to those publishers (like it did for Bulletin and AdTrader) on the grounds that some or all of the clicks or impressions generated on that website were somehow invalid.

41.     Apparently, some executive at Google read this August 25, 2017 article and realized that it publicly exposed that Google was not giving full refunds or credits as contractually obligated.  On or around September 1, 2017, Google suddenly changed the terms of the contract governing its relationship with AdWords advertisers – the Google Inc. Advertising Program Terms.  The primary change it effected to this agreement was that AdWords advertisers were now required to arbitrate their disputes with Google and were precluded from bringing any class actions against Google.  It is plainly obvious that Google made such changes directly in response to the August 25, 2017 Wall Street Journal article to prevent advertisers (especially smaller advertisers) from suing Google and obtaining redress.

42.     Moreover, even if Google was, in fact, refunding advertisers as it claims to do, such acts would also be a contractual violation to its AdX publishers because Google's internal policy is that once a refund takes place, the AdX publisher cannot recover its withheld earnings under any circumstances.  Thus, even if Google's decision to withhold an AdX publisher's accrued earnings was entirely erroneous, it refuses to pay out that publisher's earnings once a refund has been processed.

43.     The existence of this supposed Google policy was revealed upon the filing of the AdTrader lawsuit.  As recounted in that lawsuit, on a May 24, 2017 recorded telephone call, a high-level Google executive named Anthony Nakache told AdTrader's employees that:

> AdTrader:  All of the money is going to be refunded to advertisers?
>
> Nakache:  Yes.
>
> AdTrader:  Does that mean that every single impression and every single click for all of our publishers has been…
>
> Nakache:  Exactly.  Everything in the account, the account is in violation of our policy, advertisers have been impacted, and as a result we have made the decision to refund all the advertisers and all the revshare from Google.
>
> ***

AdTrader:  So, every single advertisers [sic] who has bought a single impression for the past two months from any of our publishers will get their money back?  Is that correct?

Nakache:  Yes.

***

AdTrader:  I see. OK, so we are not going to receive anything unless the appeal is successful we will not be paid anything.

Nakache: No, the money is going to be paid back to the advertisers.

AdTrader: So, whether the appeal is successful or not, we will still not receive the payment, is that correct?

Nakache: Yes.

44.    If one assumes that Mr. Nakache was telling the truth (which is itself unclear), then because Google supposedly sends out those refunds before the AdX publisher even has time to appeal Google's decision, the decision to withhold accrued earnings is automatically a *fait accompli.*

### *Class Action Allegations*

45.    Bulletin brings this action on behalf of itself and a Publisher Class, defined as:

> All online publishers and Network Partner Managers that have displayed advertisements served from the DoubleClick Ad Exchange and, at any time during the applicable limitations period, have had their accrued DoubleClick Ad Exchange earnings reduced by Google, in any amount, on account of what Google claimed to be fraudulent or invalid click activity or impressions.

46.    Bulletin also brings this action on behalf of itself and a Publisher Forfeiture Sub-Class, defined as:

> All online publishers and Network Partner Managers that have displayed advertisements served from the DoubleClick Ad Exchange and, at any time during the applicable limitations period, had the entirety of their accrued DoubleClick Ad Exchange earnings withheld by Google on account of what Google claimed to be fraudulent or invalid click activity or impressions.

47.    Through the process of seeking and obtaining class certification, Bulletin reserves the right to amend the definitions of the proposed classes, as appropriate.

48.    Excluded from the Classes and the Sub-Class are the officers, directors, and employees of Google, any judicial officer presiding over this action, and the members of his or her immediate family and judicial staff.

COMPLAINT

49.     This action is brought and may properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

50.     The Classes and the Sub-Class are so numerous that joinder of all members is impracticable.  There are tens of thousands, if not hundreds of thousands, of online publishers that have displayed advertisements served from the DoubleClick Ad Exchange and nearly all of them have, at one point in time, had their accrued earnings reduced by Google on account of what Google claimed to be fraudulent or invalid click activity or impressions.  The precise number and identity of the members of the Classes and the Sub-Class can be obtained from the records of Google.

51.     There are numerous questions of law and fact common to the members of the Classes and Sub-Class which predominate over any questions affecting only individual members including: (i) whether Google breached its contracts with its AdX publishers by withholding their accrued AdX earnings when it did not refund or credit those earnings to its advertisers, (ii) whether Google breached its contracts with its AdX publishers by withholding all of their accrued AdX earnings for purportedly invalid activity instead of only withholding the portion of the earnings actually attributable to such invalid activity, (iii) whether Google breached the implied covenant of good faith and fair dealing with its AdX publishers by withholding all of their accrued AdX earnings for purportedly invalid activity instead of only withholding the portion of the earnings actually attributable to such invalid activity, (iv) whether Google breached the implied covenant of good faith and fair dealing because when it withholds the entirety of an AdX publisher's accrued earnings, it always makes this announcement on or around the day those earnings were supposed to be paid out instead of the date Google has determined that the publisher had violated a Google policy, (v) whether Google breached the implied covenant of good faith and fair dealing because as a matter of policy, it refuses to pay withheld AdX earnings to its AdX publishers even when Google determines that it had erroneously withheld those earnings in the first place, and (vi) whether Google's Limitation of Liability clause that it imposes upon publishers participating in the DoubleClick Ad Exchange is unenforceable as an unconscionable contract provision.

COMPLAINT

1

2

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**
**(Individual and Class Action Claims)**

3      52.      Bulletin hereby re-incorporates and re-alleges all the preceding paragraphs as if

4      fully set forth herein.

5      53.      Bulletin and the other members of the Publisher Class entered into the Google

6      Services Agreement with Google.

7      54.      As previously alleged in greater detail, Bulletin and the other members of the

8      Publisher Class substantially performed all of their obligations under the Google Services

9      Agreement.  Bulletin and the Publisher Class published on their websites advertisements served

10     to them through AdX, and generated advertising revenue for Google by doing so.

11     55.      In breach of the Google Services Agreement, Google failed to pay Bulletin and the

12     other members of the Publisher Class for the number of valid impressions of advertisements

13     displayed on those websites, and/or other valid events performed in connection with the display

14     of advertisements on those websites using Google's AdX program.

15     56.      Per the express terms of the Google Service Agreement, Google could withhold an

16     AdX publisher's accrued earnings only for "(i) invalid queries, impressions, conversions, or

17     clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to

18     comply with this Agreement, as reasonably determined by Google."  In other words, Google

19     could not withhold accrued earnings only for invalid activity on an AdX publisher's website, but

20     only if Google had actually refunded its advertisers that had displayed advertisements on those

21     publishers' websites.

22     57.      In breach of the Google Services Agreement, Google withheld accrued AdX

23     earnings from Bulletin, and all other members of the Publisher Class, for purported invalid

24     activity but failed to refund the affected advertisers the full amounts that Google had withheld

25     from Bulletin and the other members of the Publisher Class.

26     58.      As a proximate result of Google's breach of contract, Bulletin, and all other

27     members of the Publisher Class, have been damaged in the amount of the accrued AdX earnings

28     that Google withheld from them but failed to refund to its advertisers.  Bulletin itself had

COMPLAINT

$268,593.65 in accrued earnings that Google failed to pay, as well as amounts that Google had deducted in prior months for supposedly invalid activity.

59.     Bulletin also brings a breach of contract claim on behalf of itself and all other members of the Publisher Forfeiture Sub-Class.

60.     Per the express terms of the Google Service Agreement, Google could withhold an AdX publisher's accrued earnings only for "(i) invalid queries, impressions, conversions, or clicks, and (ii) any amounts refunded to advertisers in connection with Company's failure to comply with this Agreement, as reasonably determined by Google." In other words, Google could withhold only those accrued earnings that were the product of invalid activity, and could not penalize an AdX publisher by withholding all of its accrued earnings merely because some of those earnings were the result of invalid activity.

61.     Indeed, by contrast, Google's contract with its AdSense publishers (called the AdSense Terms of Service) states the exact opposite. For example, in that contract, Google expressly reserved the right to "withhold unpaid amounts" in the event it terminates that agreement due to a publisher engaging in invalid activity.

62.     In breach of the Google Services Agreement, Google withheld all accrued AdX earnings from Bulletin, and all other members of the Publisher Forfeiture Sub-Class, for purported invalid activity rather than only those accrued earnings that were the product of invalid activity. Bulletin knows for a fact that other AdX publishers had all of their accrued earnings withheld for purported invalid activity, similar to Bulletin, because other such publishers have reached out to Bulletin's representatives with similar stories of their mistreatment by Google.

63.     As a proximate result of Google's breach of contract, Bulletin, and all other members of the Publisher Forfeiture Sub-Class, have been damaged in the amount of the accrued AdX earnings that Google withheld from them that were not related to any invalid activity on their websites.

COMPLAINT

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Class Action Claim)**

64.     Bulletin hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

65.     Google has a duty under California law to act in good faith and deal fairly with Bulletin and the other members of the Publisher Class in connection with the Google Services Agreement, as well as Google's obligations in administering the AdX advertising program.

66.     Bulletin, and all other members of the Publisher Class, substantially performed under the Google Services Agreement by displaying advertisements placed through AdX on their websites.

67.     As previously alleged in greater detail, Google breached its duty of good faith and fair dealing to Bulletin and the other members of the Publisher Class by refusing to provide a meaningful review of an AdX publisher's internal appeal to Google over their purported AdX policy violations.  Forcing an AdX publisher to use such a limited appeal form is *per se* unreasonable.  It is also unreasonable because Google's violation notices to AdX publishers are exceedingly vague, yet these publishers are expected to submit an appeal based off of this extremely limited information.  It is also unreasonable that Google prevents its account representatives from providing to AdX publishers any information about the nature of their supposed policy violations.

68.     As a proximate result of Google's breach of the implied covenant of good faith and fair dealing, Bulletin, and all other members of the Publisher Class, have been damaged in the amount of the accrued AdX earnings that Google withheld from them.  Bulletin itself had $268,593.65 in accrued earnings that Google failed to pay.

69.     Bulletin also brings a breach of the implied covenant claim on behalf of itself and all other members of the Publisher Forfeiture Sub-Class.  This specific claim is plead in the alternative in the event that it is determined that Google did not breach its contractual obligations to Bulletin and all other members of the Publisher Forfeiture Sub-Class when it withheld all of their accrued AdX earnings instead of just those earnings that were the result of invalid activity.

- 14 -

70.     Bulletin, and all other members of the Publisher Forfeiture Sub-Class, substantially performed under the Google Services Agreement by displaying advertisements placed through AdX on their websites.

71.     Instead of withholding only those accrued AdX earnings attributable to invalid activity, Google instead withholds all accrued AdX earnings as a matter of uniform policy. Bulletin knows for a fact that other AdX publishers had all of their accrued earnings withheld for purported invalid activity, similar to AdTrader, because other such publishers have reached out to Bulletin's representatives with similar stories of their mistreatment by Google.  Such actions violate the implied covenant of good faith and fair dealing towards Bulletin, and all the members of the Publisher Forfeiture Sub-Class, because Google is willfully withholding accrued AdX earnings that were obtained honestly and legitimately by them.

72.     As a proximate result of Google's breaches of the implied covenant of good faith and fair dealing, Bulletin, and all other members of the Publisher Forfeiture Sub-Class, have been damaged in the amount of the accrued AdX earnings that Google withheld from them that were not related to any invalid activity on their websites.

73.     Google also violated the implied covenant of good faith and fair dealing towards Bulletin, and all other members of the Publisher Forfeiture Sub-Class, because when Google withholds the entirety of an AdX publisher's accrued earnings, it always makes this announcement on or around the day those earnings were supposed to be paid out instead of the date Google has determined that the publisher had violated a Google policy.  Bulletin knows this for a fact because other such publishers have reached out to its representatives with similar stories of their mistreatment by Google.

74.     Google deliberately forces its publishers to expend resources and time on continuing to display AdX advertisements and acquiring traffic to their websites when Google had already internally decided it would not pay out any AdX revenue to those publishers under any circumstances.  Google does this because when it confiscates the funds from a publisher and refunds them back to the advertiser (assuming that Google does, in fact, provide such refunds), it effectively and substantially lowers that advertiser's cost of advertising, **at the publisher's, not**

**Google's** expense.  That is, the advertiser still received the impression from the person who was browsing the publisher's website, but did not have to pay for it.  Through this process, Google earns substantial goodwill from its advertiser customer base, and obtains a competitive advantage vis-à-vis its competitors in the online advertising business who do not confiscate their publishers' accrued earnings and kick them back to the advertiser.

75.     As a proximate result of Google's breaches of the implied covenant of good faith and fair dealing, Bulletin, and all other members of the Publisher Forfeiture Sub-Class, have been damaged in the amount of the accrued AdX earnings that Google withheld from them that were earned by those publishers after the date that Google had internally determined that it was going to withhold the entirety of those publisher's accrued earnings.

76.     Finally, Google additionally violated the implied covenant of good faith and fair dealing towards Bulletin, and all other members of the Publisher Forfeiture Sub-Class, because when Google makes the determination that it will withhold the entirety of an AdX publisher's accrued earnings, as a matter of policy, there is nothing that publisher can do to get its money.  In other words, Google could concede that it had unjustly suspended/terminated an AdX publisher's account (the account suspension/termination being the only reason why the entirety of a publisher's accrued earnings would be withheld), but Google would nonetheless refuse to pay the AdX publisher what it was owed.

77.     As a proximate result of Google's breaches of the implied covenant of good faith and fair dealing, Bulletin, and all other members of the Publisher Forfeiture Sub-Class, have been damaged in the amount of the accrued AdX earnings that Google withheld from them.

**THIRD CAUSE OF ACTION**
**(Declaratory Relief)**
**(Class Action Claims)**

78.     Bulletin hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

79.     The Google Service Agreement includes a Limitation of Liability provision that exempts Google from liability for any "lost revenues or indirect, special, incidental, consequential, exemplary, or punitive damages[.]"  The Limitation of Liability also states that

COMPLAINT

1    liability is limited to no more "than the net amount that [Google] has received and retained under

2    this Agreement during the 12 months before the claim arises."

3         80.    Google has always invoked its Limitation of Liability clause in other lawsuits

4    brought by AdSense or AdX publishers to argue that it owes no liability to those publishers.  It is

5    expected that Google will invoke that provision in this lawsuit as well.

6         81.    Bulletin seeks a declaration, on behalf of all members of the Publisher Class, that

7    this Limitation of Liability clause is substantively and procedurally unconscionable and therefore

8    unenforceable under principles of California contract law.

9         82.    The Limitation of Liability clause is substantively unconscionable because it is

10   transparently one-sided in favor of Google.  There are almost no instances in which an AdX

11   publisher could engage in conduct that could cause "consequential, special, indirect, exemplary or

12   punitive" damages to Google.  Similarly, there is no benefit to an AdX publisher to limit

13   Google's liability to the amounts it retained in the prior 12 months before the claim arises, as

14   opposed to the entirety of the applicable limitations period.  These terms therefore operate only

15   for Google's benefit and to the detriment of AdX publishers.

16        83.    And in the few examples of where an AdX publisher's conduct could conceivably

17   cause more-than-compensatory damages to Google, Google has expressly exempted such

18   examples from the Limitation of Liability clause.  For example, the Google Services Agreement

19   explicitly excludes from the Limitations of Liability clause "breaches of confidentiality

20   obligations contained in this Agreement, violations of a party's Intellectual Property Rights by the

21   other party, or indemnification obligations contained in this Agreement[.]"  Each of the examples

22   inures solely to the benefit of Google.  No publisher could possibly disclose confidential

23   information to Google (as their entire business model is to publish content on the Internet),

24   whereas Google regards even its most banal internal e-mails to be confidential (as evidenced by

25   the fact that in every lawsuit it is involved in, Google marks almost all of its internal documents

26   to be "Confidential" or "Attorney's Eyes Only" regardless of the actual content of those

27   documents).  Similarly, Google is not in any conceivable position to violate any intellectual

28   property rights held by a publisher whereas the various AdX platforms and their interfaces are

COMPLAINT

considered by Google to be their proprietary intellectual property.  The examples of indemnification provided in the agreement also make it clear that there is no likely scenario where a publisher could require Google to provide indemnification from a third-party lawsuit.  Thus, the Limitations of Liability are authored to give off the illusion of bilateralism, but in substance operate solely to prevent publishers from recovering their damages due to Google's wrongful conduct.

84.    The Limitation of Liability clause is procedurally unconscionable for many reasons, not least of which is it presented as a take-it-or-leave it provision to AdX publishers. And given that Google has a virtual monopoly in the field of on-line advertising, anyone who wishes to monetize their websites through advertising has to use AdX (or AdSense, which has a virtually identical Limitation of Liability clause).

## **PRAYER**

**WHEREFORE**, Plaintiff Bulletin Marketing, LLC prays for judgment as follows:

1.    For judgment against defendant Google, LLC;

2.    For compensatory damages;

3.    For declaratory relief;

4.    For restitution;

5.    For pre-judgment interest;

6.    For attorney's fees and costs; and

7.    For such other and further relief as the Court deems just and proper.


Dated:  December 20, 2017              GAW | POE LLP


By: _____
                                        Randolph Gaw
                                        Attorneys for Plaintiff Bulletin
                                        Marketing, LLC.

COMPLAINT

1

## JURY DEMAND

2        Plaintiff Bulletin Marketing, LLC. hereby demands a jury trial for its claims against

3  defendant Google, LLC.

4

5        Dated:  December 20, 2017              GAW | POE LLP

6

7                                              By:

8                                                  Randolph Gaw
                                                   Attorneys for Plaintiff Bulletin
9                                                  Marketing, LLC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT